### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OLYMPUS AMERICA INC.
3500 Corporate Parkway
Center Valley, PA 18034

       Plaintiff,

    v.

ARTHROCARE CORPORATION
7000 W. William Cannon Drive
Austin, Texas 78735

and

CLAYTON WILLIARD
3223 Judy Place NE
Albuquerque, NM 87111

       Defendants.

Civil Action No. _____

JURY TRIAL DEMANDED

### VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Olympus America Inc. ("Olympus" or "Plaintiff"), by and through its undersigned counsel, hereby brings this Verified Complaint seeking injunctive relief and monetary damages against Defendants ArthroCare Corporation ("ArthroCare") and Clayton Williard ("Williard") (collectively, "Defendants") and avers as follows:

### PRELIMINARY STATEMENT

1.      Williard is a former employee of Olympus who worked as an ear, nose and throat ("ENT") Territory Manager until he voluntary terminated his employment effective May 23, 2014. Williard has breached his obligations under the Field Sales and Field Sales Management Agreement (the "Agreement") that he signed, in consideration of his commencing employment with Olympus, on February 18, 2012. A copy of the Agreement is attached hereto as Exhibit A.

2.      By his own admission, Williard completely understood that the Agreement restricted him from performing similar work for ArthroCare for one year after his employment with Olympus ended.  Mr. Williard previously testified as a witness in another matter about his understanding of the Agreement:  "To me it's pretty straightforward.  I don't go work for a competitor for a certain period of time after, you know, I leave Olympus." *See* Excerpts of the Deposition Testimony of Clayton Williard in *Olympus America, Inc. v. Karl Storz Endoscopy-America, Inc., et al.*, June 26, 2013 (hereinafter, "Williard Dep."), attached hereto as Ex. B, at 30:7-9; *see also id.* at 39:20-21 (Williard stating, "I can't go work for a company that sells competing products for a year after I -- if I left [Olympus].").

3.      Despite this clear understanding, Williard resigned from Olympus effective May 23, 2014 and in breach of the Agreement, began working as a ENT Territory Manager for ArthroCare – in the same position, selling similar competitive products, in the same territory and calling on the same customers as when he worked for Olympus.

4.      Tellingly, five days before announcing his resignation, Williard downloaded the contents of his entire Olympus customer contact list and sent it from his Olympus computer to his personal email address.

5.      Without question, ArthroCare is a competitor of Olympus.  ArthroCare is expressly listed as a competitor in the non-compete provision of the Agreement.  *See* Exhibit A, Schedule A.  Moreover, ArthroCare concedes *by its own admission* that it is a "primary competitor" of Olympus.  *See, e.g.*, Excerpt from ArthroCare 2013 SEC Form 10-K Annual Report, at 7, 15, attached hereto as Exhibit C.

6.      ArthroCare has exhibited a pattern of interfering with the valid non-competition agreements of its competitors.  Shockingly, one of these instances involved

ArthroCare hiring an employee away from a then subsidiary of Olympus, Gyrus.[1] The individual in question held essentially the same position as Williard – ENT representative – for the New Mexico territory. In that case, a New Mexico state court granted an injunction prohibiting the former employee from, *inter alia*, working for ArthroCare in *any way* involving or relating to the marketing, distribution, or sale of ENT medical devices and implants in the New Mexico Territory that he previously serviced for Gyrus (i.e., the same relief Olympus seeks here). *See* Exhibit D, Docket Report Showing Order Granting Injunction, *Gyrus ACMI LP v. ArthroCare Corp. and Hogan*, No. D-1329-CV-20081204 (July 7, 2008 New Mexico Second District Court, Bernalillo District). ArthroCare was also sued most recently in Ohio state court for interfering with a competitor's valid non-compete agreement, and again, the court granted injunctive relief to stop the employee from breaching the agreement. *See* Exhibit E, Granting Temporary Restraining Order and Preliminary Injunction Hearing, *CDC Medical LLC v. ArthroCare Corp. and Ferrara*, No. 13CV003787 (April 5, 2013 Ohio Ct. Common Pleas).

7.      Olympus seeks injunctive and other relief against Williard to enforce the terms of the Agreement, to halt Williard's unlawful conduct, and to protect its customer goodwill and confidential customer and proprietary information. Olympus also seeks damages from ArthroCare due to ArthroCare's tortious interference with Olympus's Agreement with Williard.

8.      Notably, the injunctive relief Olympus is seeking will not bar Williard from working completely, it will only prevent him from working for ArthroCare or any affiliated entity in the ENT field in the same territory (hereinafter, the "New Mexico Territory")[2] where he

---

[1]      At the time of that lawsuit, Olympus's ENT division was structured within its subsidiary, Gyrus ACMI LP. Olympus has since restructured and Gyrus is no longer an operating entity.

[2]      The "New Mexico Territory" where Williard worked for Olympus encompasses the entire state of New Mexico as well as the following cities: Durango, CO; El Paso, TX;

worked for Olympus for one year. It will similarly prevent Williard from soliciting Olympus customer and prospective customers for one year, and will prevent Williard from disclosing Olympus's confidential information and trade secrets. The injunction will not prevent Williard from working for ArthroCare in the New Mexico Territory *in a field other than ENT*, it will not prevent Williard from working for ArthroCare in ENT *in any territory other than the New Mexico Territory,* and it will not prevent Williard from working from ArthoCare *in any capacity after one year.* By way of just one example, ArthroCare has a Sports Medicine division where Williard could be placed, even in New Mexico, without any objection from Olympus.

9.      Olympus sought to resolve this matter amicably by reaching an agreement whereby Williard could work for ArthroCare in a capacity or geographic territory that would not violate his Agreement and reached out multiple times to Williard and ArthroCare to do so. Defendants, however, delayed and avoided Olympus's calls and thereafter proposed a sham solution that would allow Williard to compete and solicit customers within the New Mexico Territory indiscriminately.

10.     Olympus additionally seeks monetary damages to compensate it for the considerable losses it will suffer as a result of Williard and ArthroCare's unlawful conduct.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship in that Olympus is a citizen of different states than ArthroCare and Williard and the amount in controversy exceeds $75,000.00.

12.     Venue is proper in this Court under 28 U.S.C. § 1391 pursuant to the parties' valid forum selection clause which provides that any proceeding with respect to the

---

Lubbock, TX; and Amarillo, TX.

Agreement must be brought exclusively in the Court of Common Pleas for Lehigh County,

Pennsylvania, or in the United States District Court for the Eastern District of Pennsylvania. *See*

Agreement, ¶ 14.

## THE PARTIES

13.     Olympus is a corporation organized under the laws of New York with its

principal place of business at 3500 Corporate Parkway, Center Valley, PA 18034.

14.     Williard is an individual and a citizen of the State of New Mexico,

residing at 3223 Judy Place NE, Albuquerque, NM 87111.  He was employed as an ENT

Territory Manager for Olympus until May 23, 2014 and was assigned to the New Mexico

Territory.  Through his employment with Olympus, Williard had substantial contacts with

Olympus and its personnel within the Commonwealth of Pennsylvania.

15.     ArthroCare is a corporation organized under the laws of the Delaware with

its principal place of business at 7000 W. William Cannon Drive, Building 1, Austin, Texas

78735.  Upon information and belief, ArthroCare does significant business within the

Commonwealth of Pennsylvania.

## FACTUAL ALLEGATIONS

**A.     Olympus's Background and Competition in the ENT Field**

16.     Olympus is a precision technology leader that designs and delivers

innovative solutions in medical and surgical products.  Olympus supports the work of healthcare

professionals by providing advanced, minimally invasive therapeutic and diagnostic technologies

to improve the quality of patient care around the globe. Olympus's technologies serve a variety

of medical specialties, including ENT.  Olympus has a substantial presence in the ENT market in

the U.S. and in the New Mexico Territory specifically.

17.     The ENT medical device field is a competitive industry.

18.     By its own admission, ArthroCare competes with Olympus in connection with at least six ENT-related procedures:  (1) Turbinate Reduction - Submocosal Resection Approach; (2) Turbinate Reduction - Radio Frequency Ablation Approach; (3) Base of Tongue Resection, (4) Nasal Splinting/Absorbable Product, (5) Adenoidectomy, and (6) Laryngeal Lesion Resections.  *See* Email from Kari Smith, ArthroCare Associate General Counsel dated June 9, 2014 ("Smith Email"), attached as ExhibitF.  ArthroCare admits that, with respect to these six procedures, ArthroCare and Olympus have competing product lines.

19.     In addition to the competitive ENT products and procedures identified by ArthroCare, Olympus and ArthroCare also compete with respect to additional procedures, such as console, and products, such as Plasmacision.

20.     Many of these competing products are very similar in that (other than their name brand) they are structurally the same, serve the same purpose, and are used for the same procedures.

21.     ENT Territory Managers at Olympus, including Williard, regularly promote these ENT products to medical professionals.

22.     Cultivating customer loyalty and repeat business among medical professionals is critical to Olympus's success in a competitive business environment.  One of Olympus's main business challenges is to develop, maintain, and increase its customer base.  Olympus aims to foster secure, long-lasting relationships with its customers by encouraging its employees to develop meaningful relationships with existing and prospective customers.

23.     In the ENT field, representatives and Territory Managers are expected to target specific accounts and business opportunities and make it a goal to convert competitor's customers to their own products.

24.     Olympus's ENT Territory Managers serve as the face of Olympus in the field and provide direct services to ENT professionals.  ENT Territory Managers are required to develop and maintain direct and continuous sales and marketing relationships with such customers on a one-to-one and personal basis.  Olympus does substantial repeat business with its customers.

25.     ENT Territory Managers have valuable relationships with and knowledge of key decisionmakers and other personnel who have responsibility for the purchase of ENT products at customer sites.

26.     ENT Territory Managers are also expected to generate new business through focused sales efforts.  ENT Territory Managers achieve this goal, in part, by using market research developed by Olympus.

27.     Olympus requires that ENT Territory Managers, such as Williard, execute an Agreement containing non-compete, non-solicitation, and confidentiality and trade secret obligations upon commencing employment in an effort to protect its legitimate business interests.

**B.     Olympus Hires Williard as an ENT Territory Manager**

28.     On or about February 20, 2012, Olympus offered Williard, a former Gyrus employee, a position as an ENT Territory Manager in the New Mexico Territory.

29.     Williard's daily responsibilities included interacting with ENT customers (such as medical facilities and hospital procurement specialists) as well as clinicians and researchers, and potential Olympus customers, to develop leads, foster relationships, educate such individuals about Olympus products.  This included attending surgeries or Operating Room ("OR") visits, and conducting industry research.

30.     As a result of his position with Olympus, Williard was privy to a

significant amount of customer and potential customer contact information and had relationships with key Olympus customers.

31.     In fact, Williard had substantial contact with virtually all of Olympus's customers within the New Mexico Territory.

32.     Williard also received generous compensation during his employment. For example, his gross pay for calendar year 2012 was $180,573.90 and his gross pay for calendar year in 2013 was $177,802.00.

33.     Williard also received a generous benefits package, which included medical, vision and dental coverage, a 401(k) plan with matching contributions by Olympus, life and disability insurance, and a monthly car allowance.

### C.     Williard's Non-Competition, Non-Solicitation and Confidentiality Agreement

34.     Prior to working for Olympus, Williard had worked for Gyrus ACMI, L.P. ("Gyrus") since November 2009.  During that time, Gyrus was a subsidiary of Olympus. Williard signed an earlier non-competition agreement with Gyrus in consideration for his employment with Gyrus. *See* Gyrus Agreement, attached as Exhibit G.   In February, 2012, Williard's informed that his employment with Gyrus would be terminated, and he was offered, and accepted new employment with Olympus.

35.     In consideration of Olympus's offer of employment to Williard, Williard was required to sign the Agreement, which contains, *inter alia*, provisions regarding non-competition, non-solicitation and the protection of trade secrets and confidential information described herein.  Williard signed the Agreement on February 28, 2012.

36.     Williard signed the Agreement in consideration for his commencing a new employment relationship with Olympus.  At that time of his termination from Gyrus, some Gyrus employees were not offered positions with Olympus and were terminated.  Further, some were

offered a position with Olympus, but decided not to take the position because they declined to sign the Agreement.

        37.    Williard's Agreement contains the following agreed-upon provisions:

        a.    <u>Protection of Trade Secrets and Confidential Information</u>.  Under this provision, Williard agreed that he would not "use, disclose, or dissemination to any other person, organization, or entity or otherwise employ any Trade Secrets"[3] and would not "use, disclose, or disseminate to any other person, organization, or entity or otherwise employ any Confidential Information." *See* Agreement ¶ 6(c).[4]

        b.    <u>Non-Competition</u>.  Under this provision, Williard agreed that "for a period of twelve (12) months following the cessation of [his] employment with [Olympus], [he] will not directly or indirectly, be employed in a capacity that is the same or substantially the same or rationally related to the positions [he held] within [Olympus], by any firm or entity that directly competes with [Olympus] in the marketing or sales of endoscopes, surgical products, medical devices/equipment, or certain financial or repair services related thereto . . . if such employment is in competition with those products or services of [Olympus] for which [he] had any marketing, sales, or service responsibility as of the date [his] employment terminate[d] or at

---

[3]    The Agreement defines "Trade Secret" as any "data or information that is competitively sensitive material, and not generally known to the public, including but not limited to products planning information, marketing strategies, plans, finance, operations, customer relationships, customer profiles, customer lists, the identify of customer representatives responsible for entering into contracts with the Employer Group, specific customer needs and requirements, sales estimates, business plans, and internal performance results." *See* Agreement ¶ 6(b)(1)(A).

[4]    The Agreement further defines "Confidential Information" as "any data or information and documentation, other than Trade Secrets, which is valuable to the Employer Group and not generally known to the public, including but not limited to, any compilations of past, existing or prospective customers, customer proposals or agreements between customers and the member of the Employer Group, status of customer accounts or related information about actual or prospective customers." *Id.* ¶ 6(b)(2)(d).

any time during the two (2) years preceding termination." ." *See* Agreement ¶ 7.  This restriction is ***limited*** to "all territories assigned to [Williard] or in which he performed services during the last two (2) years of employment with [Olympus]." *Id.* (emphasis added).  Tellingly, ArthroCare is ***expressly identified*** as one of a limited number of companies that "directly competes" with Olympus.  *See* Agreement, Schedule A.

   c. <u>Non-Solicitation of Customers</u>:  Under this provision, Williard agreed that "during [his] employment with [Olympus] and for twelve (12) months after the cessation of [his] employment, [he would] not solicit, contact or call upon, or attempt to solicit, contact or call upon, any customer or prospective customer of [Olympus] for the purposes of providing [competitive] products or services." *See* Agreement ¶ 8(b).

   38. The Agreement also expressly states that it "shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without regard to the principles thereof regarding conflicts of laws." *See* Agreement ¶ 14. Olympus is based in and has a significant presence in Pennsylvania.[5]  Accordingly, the parties "wish[ed] to have any disputes resolved in [Pennsylvania,] a forum having a substantial body of law and experience with the matters contained in this Agreement" and "irrevocably waive[d] any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum." *Id.*

   39. Williard further acknowledged under the Agreement that any breach of the

---

[5] Indeed, Olympus's hub is its headquarters in Center Valley, Pennsylvania.  Every key Olympus function is strongly connected to its Center Valley headquarters.  The IT support team (laptop, iPad, IPhone and digital media for these devices) is based in Center Valley, as the Customer Relationship Management team and Technical Assistance Center for customer teams. Human Resources, Sales and Marketing, Corporate Accounts, Data Analytics and support functions all report to Center Valley.  In other words, Center Valley, Pennsylvania is at the head of Olympus's U.S. business operations.

provisions identified above would result in irreparable and continuing harm, entitling Olympus to, *inter alia*, immediate injunctive relief and recovery of all sums and costs, including but not limited to attorneys' fees. *Id.* ¶ 10.

40.     Without question, Williard fully understood his obligations under the Agreement.  In fact, in a June 26, 2013 deposition, Williard emphatically testified under oath that his understanding of the Agreement was that:  "I can't go work for a company that sells competing products for a year after I -- if I left [Olympus]." *See* Williard Dep. at 39:20-21; *see also id.* at 30:7-9 ("To me it's pretty straightforward.  I don't go work for a competitor for a certain period of time after, you know, I leave Olympus."); *id.* at 34:24-25 ("I believe that my understanding [of the non-compete provision] was I wouldn't be able to sell ear, nose and throat products.").

41.     Williard also testified previously that he was specifically aware of the ten "competing companies" listed in Schedule A of the Agreement.  *Id.* at 35:2-3 ("To further that, [the Agreement] is based on certain companies that were part of that [Schedule A] addendum.").

42.     Williard's actions clearly violate the Agreement.

**D.     Williard's Access to Olympus's Confidential Information**

43.     In connection with the performance of his duties at Olympus, Williard acquired trade secrets, proprietary information and confidential information regarding, *inter alia*, Olympus's physician and hospital account customers, general pricing structure, pricing strategies, and individual customer pricing and discounts offered for the Olympus products at his customer locations, business and marketing plans and programs, business strategies and products and services that are soon to launch, in production or in the Olympus pipeline.

44.     Olympus maintained and continues to maintain such information in strictest confidence.  Among the precautions Olympus takes is to communicate to all employees

11

that such information should be kept confidential, used only as authorized and should not be communicated to third parties or competitors of Olympus.

45.    Williard had substantial access to, and frequently used trade secrets, proprietary information and confidential information of Olympus.

46.    Williard also participated in meetings with management at which such trade secrets, proprietary information and confidential information such as sales, marketing, technology and pricing information were discussed.

47.    Indeed, a week prior to downloading contact information to his personal email, Williard was invited to and attended Olympus's National Sales Conference in Orlando, Florida from April 27-30, 2014.  At this meeting, Olympus divulged to Williard confidential, sensitive information regarding its pricing, strategy, targets, and goals for the ENT business for the coming year.

48.    Among the trade secrets, proprietary information and confidential information to which Williard had access are pricing strategies and detailed lists of product prices that Olympus charges the customer accounts in Williard's territory.  ("Pricing Guides").

49.    Information contained in the Pricing Guides is not readily available through any independent source, nor has there been any public disclosure of such trade secrets, proprietary information and confidential information by any individual or entity including, but not limited to, Olympus, or any of its affiliates or its or their respective officers, employees, agents or representatives.

50.    Olympus has actively and diligently protected its trade secrets, proprietary information and confidential information, and employees execute non-disclosure agreements acknowledging Olympus's business methods are confidential and not to be disclosed to others.

51.     Williard acquired his knowledge of such information only through his employment with Olympus, and under circumstances giving rise to a duty to maintain the secrecy and integrity of such information.

**E.     Williard Resigns from Olympus and Takes Job with ArthroCare, a Direct Olympus Competitor**

52.     On or about May 12, 2014, Williard informed Olympus that he was resigning his employment effective May 23, 2014.  *See* Williard's Resignation Email dated May 12, 2014, attached hereto as Exhibit H.

53.     At or around the time he resigned from Olympus, Williard informed Olympus that he had accepted employment with ArthroCare.  Olympus learned that Williard would be taking a job as Territory Manager in the ENT Business – the same position and in the same territory as he was working for Olympus.

54.     ArthroCare, like Olympus, is engaged in the research, development, manufacturing, and marketing of endoscopic devises, surgical products, and medical devices.  Its ENT product line is substantially aligned with Olympus's ENT products.

55.     Once Olympus learned that Williard was leaving for ArthroCare, it immediately began an investigation.

56.     During the course of this investigation, Olympus learned that ArthroCare was potentially gearing their ENT marketing efforts towards Olympus customers by, for example, showcasing purported advantages of an ArthroCare Turbinate Reduction product—one of the products identified as "competitive" by ArthroCare — to an Olympus's Turbinate Reduction Product.

57.     Counsel for Olympus promptly reached out to both Williard and Richard W Rew, II ("Rew"), ArthroCare's General Counsel, seeking clarification as to what Williard's

role at ArthroCare would be and what measures would be taken to ensure Williard would not breach his obligations to Olympus.

58.     On or around May 30, 2014, Olympus's counsel again followed up with Rew via telephone to discuss the issue.  Despite leaving numerous voicemails throughout the following days, counsel for Olympus still received no response.

59.     Counsel for Olympus once again reached out to Rew, by telephone on June 4, 2014.  At that time, counsel for Olympus learned that Rew was out of the country both that week (ending June 6) and the following week (ending June 13).

60.     Between June 4 and June 9, counsel for Olympus left several voice messages with other ArthroCare in-house attorneys requesting a response, but to no avail.

61.     For example, early on June 6, counsel for Olympus attempted to contact an individual in ArthroCare's legal department, but was transferred to Rew's assistant.  Rew's assistant stated that Rew was the only individual with knowledge of the issue and that he could be reached by email.  Later on June 6, counsel for Olympus attempted to contact Rew via email at the email address provided by his assistant, but received no response.

62.     On June 9, 2014, Kari Smith, ArthroCare Associate General Counsel, finally responded to Olympus's multiple messages, but hardly provided assurance that Williard would not violate his obligations to Olympus.  To the contrary, Ms. Smith admitted that "we have competitive overlap [with Olympus] in several areas" and proceeded to list six procedures and products in which ArthroCare agrees that it is competitive with Olympus.

63.     Alarmingly, all that Ms. Smith offered by way of addressing Olympus's concerns was:  (1)  a list of job responsibilities of an ENT Territory Manager that she admittedly copied from one of ArthroCare's generic job descriptions; (2) a list of products on Olympus's

websites that, in Ms. Smith's opinion, are not competitive with any ArthroCare products; (3) Ms. Smith's statement that ArthroCare required Williard to represent in writing that he would not disclose Olympus's confidential or proprietary information or bring documents or property belonging to any prior employer onto the premises of ArthroCare; and (4) Ms. Smith's statement that ArthroCare would require Williard to forward to his manager for processing any inquiries or requests regarding the *several* competitive products that Williard called upon in his last two years of employment with Olympus.

64.     Such a proposal is a sham and allows Mr. Williard to breach his Agreement indiscriminately.  For example, ArthroCare would like Olympus to simply "trust" that it is only the physicians who are reaching out to buy competitive products, and that Mr. Williard is not in fact attempting to *sell* the several competitive offerings of ArthroCare.  If this were in fact true, there would be no need for Mr. Williard to be in the territory in the first instance, and someone else could simply serve as an "order taker."

65.     On June 10, 2014, counsel for Olympus responded to Ms. Smith's email via voicemail and stated that ArthroCare had not sufficiently addressed Olympus's concerns and that Williard's job at ArthroCare was a violation of the Agreement.  To that end, Olympus's Counsel requested that ArthroCare temporarily remove Williard from his duties at ArthroCare in the ENT field until the parties had further opportunity to resolve the matter amicably.

66.     Later on June 10, 2014, Matt Scheele ("Scheele"), Associate General Counsel for Arthrocare left a voicemail and sent an email to counsel for Olympus stating that "ArthroCare continues to believe that the protections put in place with regard to products overlapping with Mr. Williard's obligations under the Non-Compete Agreement are more than sufficient, and will not at this time deviate from its plan stated [in Ms. Smith's June 9 email] to

require Mr. Williard to accordingly forward any inquiries and requests on these overlapping

products to his manager for processing and support." *See* Email from M. Scheele to S. Bouchard

dated June 10, 2014, attached as Exhibit I.

      67.     On the morning of June 11, 2014, counsel for Olympus responded to

Scheele's email and reiterated that the purported restrictions offered by ArthroCare were

unacceptable and that, by knowingly interfering with Williard's enforceable contract, ArthroCare

could be independently liable. *See* Exhibit I.  Later that morning, Scheele responded that he

would discuss the matter but noted that his "schedule is quite busy today" and offered a one-hour

time slot between 3:00 and 4:00 CDT to discuss over the phone. *Id.* Counsel for Olympus

responded with very clear instructions that "[Williard] needs to be out of the [New Mexico]

territory, or alternatively, work in a different area of your business within the same territory."

Counsel for Olympus also requested that Scheele advise if his position continues to be that

Williard will continue working as an ENT representative in New Mexico. *Id.* Scheele

confirmed this. *Id.*

      68.     Having exhausted all efforts to amicably resolve this matter and left with

no remaining options to protects its confidential information, strategies, and customer goodwill,

Olympus was forced to initiate the instant action.

## COUNT I
## BREACH OF CONTRACT
### (AGAINST WILLIARD)

      69.     Paragraphs 1 through 68 are incorporated by reference as if fully set forth

herein.

      70.     The Agreement is a valid and enforceable contract between Plaintiff and

Williard because it meets Pennsylvania state contract law requirements, reasonably protects and

advances Olympus's legitimate business interests, and the balance of the equities favors enforcement of the Agreement.

71.     Williard has breached the Agreement by providing services to ArthroCare, a direct competitor of Olympus, in the ENT field in the New Mexico Territory in direct contravention to the Agreement.

72.     Williard, due to the nature of his position with ArthroCare, has breached and/or will inevitably breach the Agreement by soliciting Olympus's customers and prospective customers in direct contravention to the Agreement.

73.     Williard, due to the nature of his position with ArthroCare, has breached and/or will inevitably breach the Agreement by disclosing or misusing Olympus's confidential and trade secret information in direct contravention to the Agreement.

74.     As a direct and proximate result of Williard's breaches of the Agreement, Olympus has suffered, and will continue to suffer, immediate and irreparable harm unless Williard is immediately enjoined.

75.     As a direct and proximate result of Williard's breach of contract, Olympus has suffered, and will continue to suffer, significant damages in terms of monetary loss.

**COUNT II**
**TORTIOUS INTERFERENCE WITH A CONTRACT**
**(AGAINST ARTHROCARE)**

76.     Paragraphs 1 through 75 are incorporated by reference as if set forth fully herein.

77.     As described above, Williard and Olympus had a valid, existing contract between them, namely, the Agreement.

78.     As described above, Williard breached the Agreement by taking a position

as an ENT Territory Manager with ArthroCare.

79.    As described above, ArthroCare was aware of the fact that its hiring of Williard was interfering with Olympus's contractual relationship with him.

80.    As described above, ArthroCare took purposeful action to harm the existing contractual relationship by soliciting, recruiting, and/or hiring Williard knowing that Williard would be in breach of his Agreement.

81.    ArthroCare took these actions without justification.  Indeed, ArthroCare refused to even temporarily move Williard into a different territory or product space for an interim period so that the parties could reach a resolution whereby Williard would not be violating the Agreement.

82.    As a direct and proximate result of ArthroCare tortious interference, Olympus will suffer substantial and irreparable damage.

83.    ArthroCare's actions have been willful and undertaken with reckless indifference to the rights and interests of Olympus.

## JURY DEMAND

Olympus demands a trial by jury as to all claims that may be tried to a jury.

## PRAYER FOR RELIEF

WHEREFORE, OLYMPUS requests the following relief:

(a)    that Williard be enjoined, preliminarily until hearing, and thereafter permanently, from breaching the obligations in the Agreement;

(b)    that Williard be enjoined, *and any person or entity working in concert with him*, preliminarily until hearing, and thereafter permanently, from working for ArthroCare in the ENT field in the New Mexico Territory for one year, from soliciting Olympus's customer

and prospective customers for one year, and from using or retaining any of Olympus's trade secrets, proprietary information or confidential information in violation of the Agreement;

(c)     that Williard be directed to immediately return to Olympus any company property he took, as well as all copies of Olympus's documents, electronic files, and information;

(d)     that Williard be ordered to promptly produce copies of all such Olympus documents, electronic files, and information during an expedited discovery process Plaintiff will request in connection with its Motion for Preliminary Injunction;

(e)     that Olympus be awarded actual, compensatory, and punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, including, but not limited to, all costs of the investigation into Williard's unlawful actions; and exemplary damages;

(f)     that Olympus be awarded damages and any other form of relief due to ArthroCare's tortious interference with Olympus's contractual relationship with Williard;

(g)     that Williard be required to disgorge his wages, including any bonuses, that he received from Olympus while engaging in some or all of the above-stated activity; and

(h)     that Olympus be awarded such other and further necessary and proper relief as the Court may deem just and proper.

Dated:  June 12, 2014

Respectfully submitted,

By: _____

Sarah E. Bouchard (PA ID 77088)
Courtney Wirth Griffin (PA ID 203466)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, Pennsylvania  19103
215-963-5000
sbouchard@morganlewis.com
cwgriffin@morganlewis.com

*Counsel for Plaintiff*

# EXHIBIT A

**OLYMPUS AMERICA INC.**
**MEDICAL SYSTEMS GROUP**
**FIELD SALES & FIELD SALES MANAGEMENT AGREEMENT**

This Field Sales & Field Sales Management Agreement ("Agreement") sets forth the terms and conditions of your employment by Olympus America Inc. ("Olympus") as a member of its field sales or field management personnel. In consideration of your employment by Olympus, and the Trade Secrets and Confidential Information (each as defined in Section 6(b)) you will receive, you and Olympus agree as follows:

    1.    <u>Territorial and Account Responsibility</u>. You agree to perform your sales and marketing duties within a certain territory and/or with certain accounts, as may be assigned or re-assigned by Olympus, in its sole discretion, at any time, with or without cause, and with or without notice. You are prohibited from engaging in any sales or marketing activity outside of your assigned territory and accounts, and from selling or marketing Olympus products to customers who you know or have reason to know intend to use those products outside of your assigned territory, except with the express written consent of the Vice President responsible for the group or division in which you are employed (hereinafter referred to as the "Vice President").

    2.    <u>Responsibilities</u>. You are required to devote your full working time and energies and best efforts to perform the sales, marketing, or other duties assigned to you by Olympus from time to time. While employed by Olympus, you are prohibited from engaging in any outside business activity and you will not represent any company, firm, organization or product line other than Olympus without the express written consent of the Vice President. In addition, except on behalf of Olympus, you will not participate in the buying, marketing, selling, or refurbishing of any used or previously owned products, whether manufactured by Olympus or any other entity, whether for your own account or on behalf of any person or entity other than Olympus. You will not use your position, influence, knowledge of Trade Secrets or Confidential Information, or Olympus's assets for personal gain. A direct or indirect financial interest, (including but not limited to joint ventures) in or with a supplier, vendor, customer or prospective customer without disclosure and written approval from the Vice President is strictly prohibited and constitutes cause for termination of employment.

    3.    <u>Demonstration Inventory</u>. From time to time during your employment with Olympus, you may be furnished with demonstration inventory to be utilized in connection with your sales or marketing activities. Title to all demonstration inventory will remain with Olympus. You agree to care for the demonstration inventory entrusted to you, and to return the demonstration inventory to Olympus immediately upon Olympus's request. You must return the demonstration inventory to Olympus in as good condition as when you received it, except for normal wear and tear. Your failure to return any demonstration inventory immediately upon demand by Olympus will subject you to termination from employment and may subject you to damages. This Section 3 also applies to automobiles, personal computers, laptop computers, pagers, portable telephones, and other equipment loaned or otherwise provided to you by Olympus.

    4.    <u>Limitations on Authority</u>. You have no authority and will not attempt to bind Olympus in any manner or make any representations or warranties regarding Olympus products and services, except as specifically set forth in writing and signed by the Vice President. Prices and all other terms and conditions of sale of Olympus products and services will be as set forth in the then-current Olympus guidelines, determined solely and absolutely by Olympus. Pricing and all other terms and conditions of sale may be changed by Olympus at any time, with or without notice. You are prohibited from executing on behalf of Olympus any non-disclosure agreement; you cannot sign for or represent Olympus in the acceptance of

information from another person or company that could be considered confidential information. All non-disclosure (and similar agreements) must be reviewed by Olympus legal counsel and shall be signed by a vice president granted the authority to bind Olympus.

     5.    <u>Commissions and Expense Reimbursement</u>.  You will be provided, from time to time, with Olympus's then-current sales commission plan and expense reimbursement policy.  The commissions described in the commission plan and your salary (if any) constitute your entire compensation package from Olympus.  In the event (i) your employment terminates, whether voluntarily or involuntarily, or (ii) you are re-classified to a non-commission position within Olympus; you will not be eligible to receive commission payments or bonuses with respect to orders which have not been shipped (in accordance with the aforementioned commission schedule) as of the effective date of termination or reclassification. To the extent that there is a conflict between this Section 5 and your sales commission plan, the terms and conditions of your sales commission plan will govern.

     6.    <u>Protection of Trade Secrets and Confidential Information</u>.

          (a)    You agree that Olympus, its parent, subsidiaries and affiliates, including, but not limited to Olympus Corporation, Olympus Corporation of the Americas, Gyrus ACMI, Inc., Gyrus ACMI, L.P., Gyrus Medical, Inc., and Gyrus ENT LLC (collectively referred to as the "Employer Group") are engaged in a highly competitive business and have expended, and continue to expend, significant resources to develop and maintain valuable customer relationships, trade secrets, and confidential and proprietary information. You agree that your work for the Employer Group will continue to bring you into close contact with many of the Employer Group's customers, trade secrets, and confidential and proprietary information. The members of the Employer Group are providing you access to customers, trade secrets, and/or confidential and proprietary information in consideration for your covenants contained in this Agreement regarding the protection of this information.  You further agree that the covenants in this Agreement are reasonable and necessary to protect the Employer Group's legitimate business interests in its customer relationships, trade secrets, and confidential and proprietary information.

          (b)    <u>Definitions of Trade Secrets and Confidential Information</u>.  You agree that as a result of the Employer Group's investments of money, skill, and time, the members of the Employer Group have developed and will continue to develop certain valuable trade secrets and confidential and proprietary information that are specific to the Employer Group's business and the disclosure of which would cause the Employer Group significant and irreparable harm.

          (1)    The term "Trade Secrets" refers to the following:

          (A)    Any data or information that is competitively sensitive material, and not generally known to the public, including but not limited to products planning information, marketing strategies, plans, finance, operations, customer relationships, customer profiles, customer lists, the identity of customer representatives responsible for entering into contracts with the Employer Group, specific customer needs and requirements, sales estimates, business plans, and internal performance results relating to the past, present or future business activities of the member of the Employer Group, and their customers, clients, and suppliers;

          (B)    Any scientific or technical information, designs, processes, procedures, formulae, new products, new product development, or improvements that are not generally known to the public and are commercially valuable and secret in the sense that their confidentiality affords the members of the Employer Group a competitive advantage over their competitors;

2

(C)     All confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, databases, inventions, information, know-how, show-how and trade secrets not generally known to the public, whether or not patentable or copyrightable; and

(D)     All documents, inventions, substances, engineering and laboratory notebooks, drawings, diagrams, specifications, bills of material, equipment, prototypes and models relating to any of the foregoing, Confidential Information not generally known to the public and stored on any computer system and software used by the Employer Group in connection with the business or operations of the Employer Group, and any other tangible manifestation of the foregoing which now exist or come into your control or possession as a result of your employment, in whatever form provided or duplicated.

(2)     The term "Confidential Information" means any data or information and documentation, other than Trade Secrets, which is valuable to the Employer Group and not generally known to the public, including but not limited to:

(A)     Financial information, including but not limited to earnings, assets, debts, prices, fee structures, volumes of purchase or sales, or other financial data, whether relating to the Employer Group generally, or to particular products, services, geographic areas, or time periods;

(B)     Supply and service information, including but not limited to information concerning the goods and services utilized or purchased by the members of the Employer Group, the names and addresses of suppliers, terms of supplier service contracts, or of particular transactions, or related information about potential suppliers, to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of particular suppliers, though generally known or available, yields advantages to the Employer Group, the details of which are not generally known;

(C)     Marketing information, including but not limited to details about ongoing or proposed marketing programs or agreements by or on behalf of the Employer Group, marketing forecasts, results of marketing efforts or information about impending transactions;

(D)     Personnel information, including but not limited to employees' personal or medical histories, compensation or other terms of employment, actual or proposed promotions, hiring, resignations, disciplinary actions, terminations or reasons therefore, training methods, performance, skills, qualifications and abilities, or other employee information; and

(E)     Customer information, including but not limited to any compilations of past, existing or prospective customers, customer proposals or agreements between customers and the members of the Employer Group, status of customer accounts or credit, or related information about actual or prospective customers.

(c)     Non-Disclosure of Trade Secrets and Confidential Information. You agree that for so long as the pertinent information or documentation remains a Trade Secret, you will not use, disclose, or disseminate to any other person, organization, or entity or otherwise employ any Trade Secrets. You further agree that both during your employment with a members of the Employer Group and after the cessation of your employment, you will not use, disclose, or disseminate to any other person, organization, or entity or otherwise employ any Confidential Information. The obligations set forth in this Agreement will not apply to any Trade Secrets or Confidential Information, which have become generally known to competitors of the Employer

3

Group through no act or omission of you.

      (d)    <u>Return of Olympus' Information</u>. Upon cessation of your employment with a member of the Employer Group or at any time the Employer Group requests, you agree to return all Employer Group materials, Trade Secrets, and Confidential Information (including without limitation all memoranda and notes containing the names, addresses, and needs of the Employer Group's customers and prospective customers) in your possession or over which you exercise control, and regardless of whether such materials were prepared by the Employer Group, you, or a third party.

      7.    <u>Non-Competition</u>.

      (a)    You agree that the Employer Group is engaged in the highly competitive business of marketing and selling competitive medical products/devices and certain financial and repair services related thereto. You agree that as a result of your position, engaging in any business, which competes directly with the Employer Group, will cause the Employer Group great and irreparable harm. You agree that your work for the Employer Group has and will bring you into close contact with many of the Employer Group's customers, Trade Secrets, Confidential Information, and other proprietary information. You further agree that the covenants in this Agreement are reasonable and necessary to protect the Employer Group's legitimate business interests in its customer relationships, Trade Secrets, Confidential Information, and other proprietary information.

      (b)    You agree that while employed by a member of the Employer Group, you will faithfully devote your best efforts and entire time to advance the interests of the Employer Group and will not, either on behalf of yourself or another, engage in any manner in any business relating to the marketing or selling of endoscopes, surgical products, medical devices/equipment, or certain financial or repair services related thereto, other than as an employee of a member of the Employer Group. You agree that for a period of twelve (12) months following the cessation of your employment with a member of the Employer Group, you will not, directly or indirectly, be employed in a capacity that is the same or substantially the same or rationally related to the position(s) held by you within the Employer Group, by any firm or entity that directly competes with the Employer Group, or any member, in the marketing or sale of endoscopes, surgical products, medical devices/equipment, or certain financial or repair services related thereto, including but not limited to any of the entities identified on the attached <u>Schedule A</u>, if such employment is in competition with those products or services of the Employer Group for which you had any marketing, sales or service responsibility as of the date your employment terminates or at any time during the two (2) years preceding your termination (collectively referred to as "Restricted Products"). This restriction applies to all territories assigned to you or in which you performed services during the last two (2) years of employment with by a member of the Employer Group. *Notwithstanding the foregoing, for employees in Georgia and Louisiana, this restriction applies only to the territories specified on <u>Schedule B</u>.* Notwithstanding anything contained in this Section 7(b) to the contrary, if your employment with a member of the Employer Group is involuntarily terminated due to poor work performance (i.e., unsuitability for your position because of poor performance, inadequate qualifications, or inability to adjust to your assigned work requirements), permanent layoff, position elimination, or reorganization; then the aforementioned 12-month non-compete period will be reduced to a period of time equal to the number of weeks (if any) for which you receive severance benefits under the then applicable separation pay plan.

      (c)    You agree that prospective employers exist and therefore employment opportunities are available to you which would not be in violation of this Section 7. You further agree that this Section 7 is reasonable in scope and does not constitute a restraint of trade with respect to your ability to obtain alternate employment in the event your employment with a member of the Employer Group terminates for any reason,

4

and regardless of whether such termination is initiated by you or the Employer Group. You further agree that this Section 7 is necessary for the protection of Trade Secrets and Confidential Information.

8.     <u>Non-Solicitation of Customers.</u>
        (a)     You agree that while employed by a member of the Employer Group, you will have contact with and become aware of the Employer Group's customers and the representatives of those customers, their names and addresses, specific customer needs and requirements, and leads and references to prospective customers. You further agree that loss of such customers will cause the Employer Group great and irreparable harm.

        (b)     Accordingly, you agree that during your employment with a member of the Employer Group and for twelve (12) months after the cessation of your employment, you will not solicit, contact or call upon, or attempt to solicit, contact or call upon, any customer or prospective customer of the Employer Group for the purpose of providing products or services, which are competitive with the Restricted Products. This restriction applies only to customers or prospective customers of the Employer Group with whom you had contact or about whom you learned Trade Secrets or Confidential Information pertaining to their business relationship with the Employer Group, or any member, during the final twenty-four (24) months of your employment by a member of the Employer Group. For purposes of this Section 8, "contact" means interaction between you and the customer or prospective customer which takes place to further the business relationship, or making sales to or performing services for the customer or prospective customer on behalf of the Employer Group.

        9.     <u>Non-Solicitation of Employees.</u>   You acknowledge and agree that solely as a result of your employment with a member of the Employer Group, you have and will come into contact with and acquire Trade Secrets and/or Confidential Information regarding some, most, or all of the Employer Group's employees. Accordingly, both during employment with a member of the Employer Group and for twelve (12) months after the cessation of employment, you will not solicit, recruit or lure away, or attempt to solicit, recruit or lure away, directly or by assisting others, any other employee of the Employer Group with whom you had contact or about whom you learned Trade Secrets or Confidential Information during the final twenty-four (24) months of your employment with a member of the Employer Group. For purposes of this Section 9, "contact" means any interaction whatsoever between you and the other employee.

        10.     <u>Enforcement.</u>    You acknowledge and agree that compliance with the covenants set forth in this Agreement is necessary to protect the business and goodwill of the Employer Group and that any breach of Sections 6, 7, 8, or 9 of this Agreement or any subsection thereof will result in irreparable and continuing harm to the Employer Group and/or its members, for which money damages may not provide adequate relief. Accordingly, in the event of any breach or anticipatory breach by you of Sections 6, 7, 8, or 9, you agree that you will not be entitled to receive any severance benefits under any separation pay plan which may be applicable and that the Employer Group, and/or its members, will be entitled to the following particular forms of relief as a result of such breach, in addition to any remedies otherwise available to it at law or equity: (a) injunctions, both preliminary and permanent, enjoining or restraining such breach or anticipatory breach, and you hereby consent to the issuance thereof forthwith and without bond by any court of competent jurisdiction; and (b) recovery of all reasonable sums and costs, including but not limited to attorneys' fees, incurred by the Employer Group, or any of its members, to enforce Sections 6, 7, 8, or 9.

        11.     <u>Employability</u>
        (a)     You affirm that you are not presently subject to a restrictive covenant or other contract or agreement of any kind, which would prohibit, restrict or limit employment with Olympus.

5

(b)     If you learn or become aware or are advised that you are subject to an actual or alleged restrictive covenant or other prior agreement, which may prohibit or restrict employment by Olympus, you will immediately notify Olympus.

(c)     You agree that you will not disclose to Olympus, use for Olympus's benefit, or induce Olympus to use any trade secret or confidential information you may possess or any intellectual property belonging to any former employer or other third party.

12.     <u>Employment At Will</u>.     Your employment with Olympus is not for any specific duration or period of time.  You are an employee at-will of Olympus. The employment relationship between Olympus and you may be terminated by either Olympus or you at any time, with or without cause and with or without notice

13.     <u>Severability</u>.     If any term or provision or scope of prohibition of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such term, provision, or portion thereof will be deemed modified so as to render it enforceable.  To the extent such term, provision, or portion thereof cannot be rendered enforceable, this Agreement will be considered divisible as to such provision, which will become null and void, leaving the remainder of this Agreement in full force and effect.

14.     <u>Governing Law and Choice of Forum</u>.  This Agreement will be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflict of laws provisions.  The parties wish to have any disputes resolved in a forum having a substantial body of law and experience with the matters contained in this Agreement.  Therefore, the parties agree that any action or proceeding with respect to this Agreement will be brought exclusively in the Court of Common Pleas for Lehigh County, Pennsylvania, or in the United States District Court for the Eastern District of Pennsylvania, and the parties agree to the jurisdiction thereof.  The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum.

15.     <u>Non-Waiver</u>.     The failure of either Olympus, another member of the Employer Group or you, whether purposeful or otherwise, to exercise in any instance any right, power, or privilege under this Agreement or under law will not constitute a waiver of any other right, power, or privilege, nor of the same right, power, or privilege in any other instance.  Any waiver by Olympus, another member of the Employer Group or by you must be in writing and signed by either you, if you are seeking to waive any of your rights under this Agreement, by the Vice President, if Olympus is seeking to waive any of its rights under this Agreement or by the vice-president of another member of the Employer Group, as applicable.

16.     <u>Modification</u>.     No modification of this Agreement will be valid unless in writing and specific reference is made to this Agreement and signed by both parties.

17.     <u>Assignment.</u>     This Agreement, including the non-competition provisions contained in Section 7, shall inure to the benefit of Olympus and its successors and assigns (including the successors, assigns, and/or surviving entities of Olympus whether the result of merger, sale, transfer or acquisition relating to all or part of Olympus' assets, divisions and/or affiliates).  You acknowledge and agree that Olympus may assign this Agreement and all rights and obligations hereunder without your consent.  This Agreement may not

EG/00001/13580.7

be assigned by you.

18.  <u>Binding Effect</u>.  This Agreement will be binding upon you, your heirs, executors and administrators and Olympus, and its successors and assigns, and will inure to the benefit of you, your heirs, executors and administrators and Olympus, and its successors and assigns.

19.  <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement between you and Olympus with respect to the subject matters of this Agreement, and fully supersedes any prior agreements or understandings between you and Olympus regarding such subject matters. Notwithstanding the foregoing, the Inventions Agreement between Olympus and you shall remain in full force and effect to the extent that it is not inconsistent with this Agreement. In the event of any inconsistency, this Agreement's provisions shall prevail. You acknowledge that you have not relied on any representations, promises, or agreements of any kind made to you in connection with your decision to sign this Agreement, except for those set forth in this Agreement.

YOU ACKNOWLEDGE THAT YOU HAVE HAD AMPLE TIME TO CAREFULLY READ, CONSIDER, AND UNDERSTAND THE PROVISIONS OF THIS AGREEMENT AND, HAVING DONE SO, AGREE THAT THE RESTRICTIONS SET FORTH IN THIS AGREEMENT (INCLUDING BUT NOT LIMITED TO THE PERIODS AND GEOGRAPHIC AREA OF RESTRICTION) ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF OLYMPUS.  YOU FURTHER ACKNOWLEDGE THAT OLYMPUS HAS ADVISED AND URGED YOU TO CONSULT WITH AN ATTORNEY CONCERNING THIS AGREEMENT AND THAT YOU HAVE HAD A FULL OPPORTUNITY TO REVIEW THIS AGREEMENT WITH AN ATTORNEY.  THIS AGREEMENT HAS IMPORTANT LEGAL CONSEQUENCES.

OLYMPUS AMERICA, INC.                          ACCEPTED & AGREED:

By: _____                    _____
_____                         _____
           *(Signature)*                                      *(Signature)*
Printed Name: Anthony Timbalya              Printed Name: Clayton Williard
Title: Manager HR
Date: 7/16/12                                          Date: 2/28/12

EG/00001/13580.7

## SCHEDULE A
## COMPETING ENTITIES

1.  Pentax Precision Instrument Corporation
2.  Karl Storz Endoscopy America, Inc.
3.  Stryker Endoscopy
4.  Factory Authorized Medical Scope Repair
5.  Medtronic ENT (Xomed)
6.  Arthrocare
7.  Grace Medical
8.  Kurz Medical
9.  Vision Science
10. Acclarent

9

**EXHIBIT B**

```
 1              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3

    OLYMPUS AMERICA INC.,
 4
                Plaintiff,
 5
    vs.                              No. 12-04134
 6
    KARL STORZ ENDOSCOPY - AMERICA,
 7  INC. And VICTOR BORY,

 8              Defendants.

 9

10              DEPOSITION OF CLAY WILLIARD

11              June 26, 2013
                   11:08 a.m.
12              Modrall Sperling
          500 Fourth Street Northwest, Suite 1000
13              Albuquerque, New Mexico

14

15

          PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE
16  this deposition was:

17
    TAKEN BY:       JUSTIN E. PROPER, ESQ.
18                  ATTORNEY FOR DEFENDANTS

19

20

21

22  REPORTED BY:    ANA MARIA GALLEGOS, RPR, CLR
                    NM CCR #190, CA CSR #9246
23                  New Mexico Depo
                    1100 Second Street NW
24                  Albuquerque, New Mexico 87102
                    (505) 244-3376
25                  setadepo@nmdepo.com
```

Page 30

1          MR. BROOKS:  Assumes they're inconsistent.

2   Can we take a look at the contracts?

3          MR. PROPER:  They are inconsistent, but

4   that's for a judge, not Mr. Williard.  I'm asking

5   Mr. Williard his understanding as to what agreement he's

6   bound by.  If he has no understanding, he has --

7          THE WITNESS:  To me it's pretty

8   straightforward.  I don't go work for a competitor for a

9   certain period of time after, you know, I leave Olympus.

10   Q.  (By Mr. Proper) Okay.  Let's --

11   A.  Whether it was -- whether I was working for Gyrus

12   or Olympus, to me it was pretty cut and dry.  I know

13   there is a lot of legal jargon in there, but it

14   doesn't -- you know, to me I pretty much know what that

15   means because I've worked for companies in the past that

16   have had the same kind of -- you know --

17   Q.  Okay.  Is it your --

18   A.  -- agreement I had to sign.

19   Q.  Is it your understanding of your employment

20   agreement with Olympus that you would be prohibited from

21   going to a competitor and selling products that you

22   never sold while you were employed by Olympus?

23          MR. BROOKS:  Objection.  Incomplete

24   hypothetical.

25   Q.  (By Mr. Proper) You can answer.

Page 34

1     Energy products for Olympus, right?

2        A.  No.

3        Q.  Doesn't this agreement say specifically that you

4     can work -- or that you're precluded from working for a

5     competitor if such employment is in competition with

6     those products or services of Olympus for which you had

7     marketing, sales or service responsibility within a

8     two-year period prior to your termination?  Isn't that

9     what this says?  Am I misreading it?  If you have a

10    different understanding, let me know.  I think the

11    language is clear, but you tell me.

12       A.  Yeah, that sounds right.

13       Q.  So if you didn't have any marketing, sales or

14    service responsibility for Energy products, do you have

15    an understanding as to whether you would be permitted

16    under this agreement that you signed to go sell Energy

17    products for a competitor?

18       A.  I believe so.

19       Q.  You believe you would be able to?

20       A.  Uh-huh.

21       Q.  Okay.  Is that a different understanding than the

22    understanding you had before you just went through this

23    language with me?

24       A.  I believe that my understanding was I wouldn't be

25    able to sell ear, nose and throat products.

Olympus America, Inc. v Karl Storz Endoscopy-America, Inc., et al.
Williard, Clay on 06/26/2013

Page 35 of 43

Page 35

1    Q.  Okay.

2    A.  To further that, it's based on certain companies

3    that were part of that addendum.

4    Q.  Correct.  There is a list that identifies the ten

5    competing companies that are referenced as part of that

6    clause.

7    A.  Right.

8    Q.  Is that what you're talking about?

9    A.  Yeah.

10   Q.  Since you began your employment with Gyrus, or

11   since you became an official employee of Olympus America

12   Incorporated, have you ever been recruited by anyone you

13   consider to be a competitor?

14   A.  No.

15   Q.  Do you know what I mean by recruited?  I'm

16   talking specifically about recruited by a competitor for

17   an open position that that company may have.

18   A.  Yes.

19   Q.  So with that in mind, is it your testimony that

20   no competitor or any recruiter on behalf of a competitor

21   has contacted you directly about an open position for

22   another company?

23   A.  True.

24   Q.  Okay.  Do you know who Michael Moore is?

25   A.  I've heard the name.

Page 39

1              MR. PROPER:  Objection, asked and answered.

2              THE WITNESS:  What did you say?

3      Q.  (By Mr. Brooks) We can -- you can answer it

4   again.  What do you consider your non-competition

5   obligations to be after signing the Olympus agreement?

6              MR. PROPER:  Objection.  Asked and answered.

7              THE WITNESS:  What is he saying?

8              MR. PROPER:  I'm saying you were already

9   asked that question by me and you answered it.  I'm just

10   putting an objection on the record.

11             THE WITNESS:  Can you ask it again?

12     Q.  (By Mr. Brooks) What did you view your

13   non-competition obligations to be after signing the

14   Olympus agreement?

15             MR. PROPER:  Same objection.

16             THE WITNESS:  Before I signed the Olympus --

17     Q.  (By Mr. Brooks) After signing?

18     A.  After signing the Olympus contract, it was the

19   same as before I signed the Olympus contract, which is

20   that I can't go work for a company that sells competing

21   products for a year after I -- if I left the company.

22     Q.  Okay.  Do you have personal knowledge as to

23   whether any Gyrus ACMI employees objected to signing

24   this new competition agreement?

25     A.  I don't.  I have no knowledge.

# EXHIBIT C

Table of Contents

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

**ANNUAL REPORT**
**PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2013

Commission File Number: 001-34607

# ARTHROCARE CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-3180312** |
| State or other jurisdiction of Incorporation or organization | (I.R.S. Employer Identification No.) |

**7000 West William Cannon, Austin, TX 78735**
(Address of principal executive offices and zip code)

**(512) 391-3900**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: **Common Stock, $0.001 Par Value**

Securities registered pursuant to Section 12 (g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐   No ☒

As of June 30, 2013, the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was approximately $975,265,320 (based upon the closing sales price of such stock as reported by NASDAQ on such date).

As of January 31, 2014, the number of outstanding shares of the Registrant's Common Stock was 28,567,064.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of our definitive Proxy Statement to be filed pursuant to Regulation 14A under the Exchange Act of 1934, as amended, in connection with our annual meeting of stockholders, scheduled to be held on or before June 22, 2014 are incorporated by reference into Part III of this Annual Report.

Table of Contents

**Our Customers and Competition**

Our primary customers across all of our product areas are surgeons and other specialized medical professionals who utilize our products to treat their patients. Our primary competitors include Medtronic, Inc., Smith & Nephew, Stryker Corporation, Johnson & Johnson (through their Mitek and Acclarent subsidiaries), Olympus (through their subsidiary Gyrus) and Arthrex, Inc. These competitors tend to be large, well-financed companies with diverse product lines.

In the Sports Medicine market, we also compete directly with competitors to whom we have licensed our technology.

For additional discussion of the risks and considerations concerning our competition, see "Part I—Item 1A—Risk Factors."

**Our Distribution Network**

*Distribution in the Americas*

We sell our Sports Medicine products in North America through a network of employee sales representatives and independent sales agents. We sell our ENT products in the U.S. exclusively through employee sales representatives. As of December 31, 2013, for these two core business areas our Americas sales organization approximated 190 people, including sales management. In South America, we sell our products through independent distributors who retain the risk of inventory obsolescence and collection from their customers. Sales in the Americas accounted for 67.2 percent, 68.4 percent and 69.0 percent of our consolidated product sales during 2013, 2012 and 2011, respectively. We continually evaluate performance of our distribution network in order to maximize our ability to cover and increase our customer base and improve the efficiency of our product sales efforts. For the year ended December 31, 2013, approximately 62 percent of Americas product sales in dollars were from employee sales representatives and the remainder was from independent sales agents or distributors.

*Distribution in International*

International sales accounted for 32.8 percent, 31.6 percent and 31.0 percent of our consolidated product sales during 2013, 2012 and 2011, respectively. In several countries in Western Europe and in Australia and Singapore, we have wholly-owned subsidiaries that sell our products directly to end users of our products. In other markets, we sell our products to independent distributors who import and sell our products in their country of domicile, with the independent distributors retaining the risk of inventory obsolescence and collection from their customers. We may expand the number of markets where we sell our products directly to end users in the future.

For the year ended December 31, 2013, approximately 74.5 percent of International sales were derived from direct markets where we sell our products to end users and the remainder of our International sales were to independent distributors.

**Geographic Information**

Product sales and long-lived assets attributable to significant geographic areas are presented in Note 17, "Segment Information" in the notes to the consolidated financial statements.

**Research and Development**

We conduct our research and development activities in the U.S. at facilities in Irvine, California and Austin, Texas. Research and development expenses as reported includes experimental research, new product development, process enhancements, process engineering, quality engineering, regulatory affairs and clinical studies and were in aggregate 9.0 percent, 8.7 percent and 8.2 percent of our total revenues during 2013, 2012 and 2011, respectively. Our efforts are focused on:

- designing new surgical devices that incorporate additional functionalities;

- developing new applications of our Coblation and other innovative technologies;

- developing complementary technologies and products for introduction into our product portfolio in order to provide more value to our customers and participate to a greater extent in certain surgical procedures; and

- modifying and enhancing the performance of our existing technologies and products, including our processes to manufacture these products.

We may continue to explore and develop the plasma physics underlying our Coblation technology and evaluate the use of our technology in new fields of treatment. We are engaged with a number of doctors, scientists and research institutions to further understand the technology and expand its applications base and technical capability.

Table of Contents

***The markets for our products are intensely competitive, which may result in our competitors developing technologies and products that are more effective than ours or that make our technologies and products obsolete. Many of our competitors have significantly greater resources and market power than we do.***

Our primary competitors across all of our operating units consist of Medtronic, Inc., Smith & Nephew, Stryker Corporation, Johnson & Johnson (through their Mitek and Acclarent subsidiaries), Olympus (through their Gyrus subsidiary), and Arthrex, Inc. These competitors tend to be large, well-financed companies with diverse product lines who may have significantly greater financial, manufacturing, marketing, distribution and technical resources than we do. Some of these companies offer broad product lines that they may offer as a single package and frequently offer significant price discounts as a competitive tactic. Furthermore, some of our competitors utilize purchasing contracts that link discounts on the purchase of one product to purchases of other products in their broad product lines. Many of the hospitals in the U.S. have purchasing contracts with our competitors. Accordingly, customers may be dissuaded from purchasing our products instead of our competitors' products to the extent the purchase would cause them to lose discounts on our competitors' products. In addition, we are aware of several small companies that may directly or indirectly compete with our products.

If we were to be unable to continue to compete for any of the above reasons, it could have a material adverse effect on our business, financial condition, results of operations and future growth prospects.

***Failure to obtain FDA clearance or approval for our products could materially adversely affect our business, results of operations, financial condition, and future growth prospects.***

The U.S. is the largest single market in which we sell our products. In the U.S., before we can market a new medical device, or a new use of, or claim for, or significant modification to an existing product, we must first receive either premarket clearance under Section 510(k) of the U.S. Federal Food, Drug, and Cosmetic Act, or FDCA, or approval of a Premarket Approval (PMA) submission from the FDA, unless an exemption applies. In the 510(k) clearance process, the FDA must determine that a proposed device is "substantially equivalent" to a device legally on the market, known as a "predicate" device, with respect to intended use, technology and safety and effectiveness, in order to clear the proposed device for marketing. Clinical data is sometimes required to support substantial equivalence. However, as was the case in our submission for 510(k) clearance of Coblator IQ ENT Plasma Wands, the FDA has a high degree of latitude when determining the amount of data it requires as part of determination and evaluation of submissions and may determine that a proposed device submitted for 510(k) clearance is not substantially equivalent, or NSE, to a predicate device.

An FDA NSE determination means that the device is automatically reclassified into Class III and we cannot market the device unless it is either approved through the PMA process or reclassified into Class I or Class II based on a new 510(k) submission with supporting data. A new submission may require clinical data. In addition, under new changes instituted by the Food and Drug Administration Safety and Innovation Act of 2012, or FDASIA, FDA may now change the classification of a medical device by administrative order, following a device classification panel meeting and public comment on the proposed reclassification. The PMA approval pathway requires an applicant to demonstrate the safety and effectiveness of the device based, in part, on data obtained in clinical trials. Both of these processes can be expensive and lengthy and entail significant user fees, unless exempt. The FDA's 510(k) clearance process usually takes from three to twelve months, but it can last longer. The process of obtaining PMA approval is much more costly and uncertain than the 510(k) clearance process. It generally takes from one to three years, or even longer, from the time the PMA application is submitted to the FDA until an approval is obtained. There is no assurance that we will be able to obtain FDA clearance or approval for any of our new products on a timely basis, or at all. Failure to obtain FDA clearance or approval for our new products could materially adversely affect our business, results of operations, financial condition, and future growth prospects.

After a device receives 510(k) premarket notification clearance from the FDA, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change in the intended use of the device, technology, materials, packaging, and certain manufacturing processes may require a new 510(k) clearance or PMA. The FDA requires every manufacturer to make the determination regarding the need for a new 510(k) clearance or PMA approval in the first instance, but the FDA may review any manufacturer's decision and may retroactively require the manufacturer to submit a premarket notification requesting 510(k) clearance or an application for PMA approval. The FDA also can require the manufacturer to cease marketing and/or recall the modified device until 510(k) clearance or approval is obtained. It is expected that the FDA will introduce new changes to existing policy and practices regarding the assessment of whether a new 510(k) is required for changes or modifications to existing devices.  For example, in response to industry and healthcare provider concerns regarding the predictability, consistency and rigor of the 510(k) regulatory pathway, the FDA initiated an evaluation of the 510(k) program, and in January 2011, announced several proposed actions intended to reform the review process governing the clearance of medical devices.  Most recently, on July 9, 2012, FDASIA was signed into law, which, among other requirements, obligates the FDA to prepare a report for Congress on the FDA's approach for determining when a new 510(k) will be required for modifications or changes to a previously cleared device.  After submitting this report, the FDA is expected to issue revised guidance to assist device manufacturers in making this determination.  Until then, manufacturers may continue

**EXHIBIT D**

D-1329-CV-200801204 - Wednesday, June 11, 2014

# GYRUS ACMI LP V HOGAN

## CASE DETAIL

| CASE # | CURRENT JUDGE | FILING DATE | COURT |
|---|---|---|---|
| D-1329-CV-200801204 | Davis, John F. | 06/30/2008 | BERNALILLO  District |

## PARTIES TO THIS CASE

| PARTY TYPE | PARTY DESCRIPTION | PARTY # | PARTY NAME |
|---|---|---|---|
| D | Defendant | 1 | HOGAN KEVIN |
| | ATTORNEY: MOODY CHRISTOPHER M. | | |
| D | Defendant | 2 | ARTHROCARE CORP |
| | ATTORNEY: SCHULTZ ANDREW G. | | |
| P | Plaintiff | 1 | GYRUS ACMI LP |
| | ATTORNEY: JARRETT DANNY W. | | |

## CIVIL COMPLAINT DETAIL

| COMPLAINT DATE | COMPLAINT SEQ # | COMPLAINT DESCRIPTION | DISP | DISP DATE |
|---|---|---|---|---|
| 06/30/2008 | 1 | OPN: COMPLAINT | | |

| COA SEQ # | COA DESCRIPTION |
|---|---|
| 1 | Miscellaneous |

| PARTY NAME | PARTY TYPE | PARTY # |
|---|---|---|
| GYRUS ACMI LP | P | 1 |
| HOGAN KEVIN | D | 1 |
| ARTHROCARE CORP | D | 2 |

## HEARINGS FOR THIS CASE

| HEARING DATE | HEARING TIME | HEARING TYPE | HEARING JUDGE | COURT | COURT ROOM |
|---|---|---|---|---|---|
| 09/09/2008 | 9:00 AM | HEARING | Davis, John F. | BERNALILLO | |

## REGISTER OF ACTIONS ACTIVITY

| EVENT DATE | EVENT DESCRIPTION | EVENT RESULT | PARTY TYPE | PARTY # | AMOUNT |
|---|---|---|---|---|---|
| 12/08/2008 | CLS: DISMISSAL WITH PREJUDICE | | | | |
| | FILED STIPULATED ORDER OF DISMISSAL  IT IS THEREFORE ORDERED THAT PL'S COMPLAINT IS HEREBY DISMISSED WITH PREJUDICE AND EACH PARTY WILL BEAR ITS OWN ATTORNEY'S FEES AND COSTS | | | | |
| 12/05/2008 | MTN: TO DISMISS | | | | |
| | FILED JOINT MOTION FOR DISMISSAL  <FAXED> | | | | |
| 10/31/2008 | CERTIFICATE OF SERVICE | | D | 2 | |
| | FILED CERTIFICATE OF SERVICE MAILED ON 10/30/08 | | | | |
| 10/07/2008 | CERTIFICATE OF SERVICE | | D | 2 | |
| | FILED CERTIFICATE OF SERVICE | | | | |
| 10/07/2008 | CERTIFICATE OF SERVICE | | D | 1 | |
| | FILED CERTIFICATE OF SERVICE <FAX COPY> | | | | |
| 09/30/2008 | CERTIFICATE OF SERVICE | | P | 1 | |
| | FILED CERTIFICATE OF SERVICE DELIVERED 09/26/08 | | | | |
| 09/22/2008 | ORD: ORDER | | | | |
| | FILED ORDER  MOTION TO VACATE ORDER ENTERED 07/07/08 IS GRANTED | | | | |
| 09/19/2008 | CERTIFICATE OF SERVICE | | P | 1 | |
| | FILED CERTIFICATE OF SERVICE MAILED ON 09/03/08 | | | | |
| 09/09/2008 | CERTIFICATE OF SERVICE | | | | |
| | FILED CERTIFICATE OF SERVICE MAILED ON 09/03/08 | | | | |
| 09/09/2008 | CERTIFICATE OF SERVICE | | P | 1 | |
| | FILED CERTIFICATE OF SERVICE MAILED ON 09/03/08 | | | | |
| 08/22/2008 | CERTIFICATE OF SERVICE | | D | 2 | |
| | FILED CERTIFICATE OF SERVICE MAILED ON 08/21/08 | | | | |
| 08/19/2008 | REPLY | | P | 1 | |
| | FILED REPLY IN SUPPORT OF DEFENDANT'S MOTION TO VACATE ORDER ENTERED JULY 07, 2008 | | | | |
| 08/04/2008 | NTC: HEARING (CIVIL) | | | | |

D-1329-CV-200801204 - Wednesday, June 11, 2014

| | | | |
|---|---|---|---|
| | FILED NOTICE OF HEARING 09/09/08 AT 1:30 PM MOTION TO VACATE ORDER | | |
| 08/04/2008 | ANSWER | D | 2 |
| | FILED DEFENDANT ARTHROCARE CORPORATION'S ANSWER TO VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF | | |
| 07/31/2008 | ANSWER | D | 1 |
| | FILED (FAXED) DEFENDNAT KEVIN HOGAN'S ANSWER TO VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF | | |
| 07/29/2008 | OBJECTION/OPPOSITION | P | 1 |
| | FILED PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO VACATE ORDER ENTERED JULY 07, 2008 | | |
| 07/14/2008 | REQUEST FOR HEARING/ | D | 1 |
| | SETTING | | |
| | FILED REQUEST FOR HEARING ON MOTION TO VACATE ORDER | | |
| 07/14/2008 | MTN: TO VACATE | D | 1 |
| | FILED DEFENDANTS ORDER TO VACATE ORDER ENTERED ON 07/07/08 | | |
| 07/11/2008 | JDG: JUDGE ASSIGN | | |
| | EXCUSAL/ CHALLENGE | | |
| | FILED NOTICE OF JUDGE ASSIGNMENT, CASE REASSIGNED TO JUDGE DAVIS DUE TO THE EXCUSAL OF JUDGE EICHWALD | | |
| 07/08/2008 | JDG: JUDGE ASSIGN | | |
| | EXCUSAL/ CHALLENGE | | |
| | FILED NOTICE OF PEREMPTORY EXCUSAL OF JUDGE EICHWALD | | |
| 07/08/2008 | TAPE & LOG RECEIPT | | |
| | FILED CLERK'S RECEIPT FOR DISC AND LOG / #CD 08-104 MOTION FOR PRELIMINARY INJUNCTION GRANTED- PERMANANT INJUNCTION | | |
| 07/08/2008 | ENTRY OF APPEARANCE | D | 1 |
| | FILED ENTRY OF APPEARANCE BY CHRISTOPHER MOODY ON BEHALF OF DEFENDANTS KEVIN HOGAN AND ARTHROCARE CORP. | | |
| 07/07/2008 | ORD: ORDER | | |
| | FILED ORDER:  FOR A PERIOD OF ONE YEAR FROM THE DATE OF THIS ORDER, HOGAN SHALL NOT ENGAGE IN, CONTRIBUTE TO, ASSIST WITH OR IN ANY WAY PARTICIPATE IN, ANY ACTIVITY INVOLVING OR RELATING TO THE CONCEPTION,DESIGN DEVELOPMENT, MANUFACTURE, MARKETING, DISTRIBUTION OR SALE OF MEDICAL DEVICES IN THE FIELD OF EAR, NOSE, AND THROAT SURGICAL INSTRUMENTS AND IMPLANTS IN THE NEW MEXICO AND NORTHWESTERN TEXAS TERRITORY THAT HE PREVIOUSLY SERVICED FOR GYRUS. | | |
| 07/07/2008 | SUMMONS RETURN | D | 2 |
| | FILED SUMMONS RETURN SERVED / LEANNE MARTONY FOR DF ON 7-1-08 | | |
| 07/07/2008 | SUMMONS RETURN | D | 1 |
| | FILED SUMMONS RETURN SERVED / DF KEVIN HOGAN ON 7-1-08 | | |
| 07/07/2008 | ENTRY OF APPEARANCE | P | 1 |
| | FILED ENTRY OF APPEARANCE BY / DANNY W. JARRETT, ESQ ON BEHALF OF THE PLIANTIFF | | |
| 07/07/2008 | JDG: JUDGE ASSIGN | | |
| | EXCUSAL/ CHALLENGE | | |
| | FILED NOTICE OF JUDGE ASSIGNMENT CASE REASSIGNED TO JUDGE EICHWALD DUE TO THE EXCUSAL OF JUDGE MCDONALD | | |
| 07/03/2008 | JDG: JUDGE EXCUSAL/ | D | 2 |
| | CHALLENGE | | |
| | FILED PEREMPTORY ELECTION TO EXCUSE A DISTRICT JUDGE | | |
| 07/03/2008 | ENTRY OF APPEARANCE | D | 2 |
| | FILED ENTRY OF APPEARANCE BY / ANDREW G. SCHULTZ ON BEHALF OF DF ARTHROCARE CORP | | |
| 06/30/2008 | NTC: HEARING (CIVIL) | | |
| | FILED NOTICE OF HEARING 07/07/08 AT 3:00 PM ON COMPLAINT FOR INJUNCTIVE RELIEF | | |
| 06/30/2008 | REQUEST FOR HEARING/ | P | 1 |
| | SETTING | | |
| | FILED EMERGENCY REQUEST FOR SETTING ON THE MOTION FOR A PRELIMINARY INJUNCTION | | |
| 06/30/2008 | MEMORANDUM | | |
| | FILED PLAINTIFF GYRUS ACMI'S MEMORANDUM OF FACT AND LAW IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION | | |
| 06/30/2008 | MTN: MOTION | P | 1 |
| | FILED PLAINTIFF'S GYRUS ACMI'S MOTION FOR A PRELIMINARY INJUNCTION | | |
| 06/30/2008 | SUMMONS ISSUED | | |
| 06/30/2008 | OPN: COMPLAINT | P | 1 |
| | FILED VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF | | |
| 06/30/2008 | ASM: CIVIL FILING W/ | | |
| | ARBITRAT | | |

## JUDGE ASSIGNMENT HISTORY

| ASSIGNMENT DATE | JUDGE NAME | SEQ # | ASSIGNMENT EVENT DESCRIPTION |
|---|---|---|---|
| 06/30/2008 | McDonald, Louis P. | 1 | INITIAL ASSIGNMENT |
| 07/07/2008 | Eichwald, George P. | 2 | Judge Excused/Challenged |
| 07/11/2008 | Davis, John F. | 3 | Judge Excused/Challenged |

# EXHIBIT E

E1822 - Y91



## COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

CDC Medical, LLC                          :
8628 Industrial Parkway, Suite G          :    Case No. 13CV003787
Plain City, Ohio 43064,                   :
                                          :
            Plaintiff,                    :    Judge Holbrook
                                          :
      v.                                  :
                                          :
Jason Ferrara                             :
1027 Westchester Way                      :    **ORDER GRANTING PLAINTIFF'S**
Cincinnati, Ohio 45244,                   :    **MOTION FOR TEMPORARY**
                                          :    **RESTRAINING ORDER AGAINST**
            Defendant.                    :    **DEFENDANTS**
                                          :
and                                       :
                                          :
ArthroCare Corporation                    :
7000 W. William Cannon Drive, Bldg.       :
1                                         :
Austin, Texas 78735,                      :
                                          :
            Defendant.                    :

_Filed Common Pleas Court Franklin Co. OH 2013 APR -5 PM 2:06 Clerk of Courts-Cts_

This matter is before the Court pursuant to the Motion of Plaintiff, CDC Medical, LLC, ("Plaintiff") pursuant to Rule 65 of the Ohio Rules of Civil Procedure, for a Temporary Restraining Order and Preliminary Injunction against Defendant Jason Ferrara and Defendant ArthroCare Corporation (collectively, "Defendants"). Having reviewed the pleadings and other papers filed by Plaintiff, including but not limited to the Verified Complaint, Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, Plaintiff's Memorandum in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction, and the arguments of counsel, the Court finds as follows:

**_WHEREFORE_**, for good cause shown, it is hereby **ORDERED** that Plaintiff's Motion be and hereby is **GRANTED**, and Defendants and those persons acting in concert or participation with

1

2

E1822 - Y92 

them who receive actual notice of this Order, pending a preliminary injunction hearing in this action, are enjoined, until further Order of this Court, from: (a) breaching the Sales Contractor Agreement between Plaintiff and Defendant Ferrara attached as Exhibit A to the Verified Complaint in any manner, including, but not limited to, Defendant Ferrara being employed by Defendant ArthroCare, directly or indirectly, or Defendant Ferrara providing any sales services for or on behalf of Defendant ArthroCare; and (b) using Plaintiff's confidential information and trade secrets in furtherance of the business of Defendant ArthroCare for any reason.

The Court FURTHER ORDERS that this Order shall remain in full force and effect until hearing and determination are had on Plaintiff's Motion for Preliminary Injunction.

The Court FURTHER ORDERS that a hearing will be held in before Magistrate Elizabeth Watters on Plaintiff's Motion for Preliminary Injunction on the 17th day of April, 2013 at 1:30 p.m.

The Court FURTHER ORDERS that Plaintiff provide a $5,000 security bond or, in lieu of such bond, deposit with the clerk of the court a cashier's check or certified check in the amount of $5,000.

IT IS SO ORDERED, this the 5th day of April 2013.

JUDGE HOLBROOK

COLUMBUS/'670747v.1

**EXHIBIT F**

| From: | Kari Smith [Kari.Smith@ArthroCare.com] |
|---|---|
| Sent: | Monday, June 09, 2014 11:44 AM |
| To: | Brigham, Brandon J. |
| Cc: | Matt Scheele |
| Subject: | Clay Williard's Non-Compete Obligations |

Mr. Brigham:

As indicated in our telephone conversation late Friday afternoon, I have tried to gather as much information as I can regarding Clayton ("Clay") Williard. Kindly note: While I, too, am hopeful for a amicable resolution, I have also distributed a notice of litigation hold and evidence preservation memorandum. While I recognize you have had prior dealings with Mr. Rew, because I was not privy to those conversations I hope you will first confirm that the documents I have gathered are, in fact, the ones to which you refer in your email dated 6 June 2014.

In your email on Friday, you referred to a "Non-Competition and Non-Disclosure Agreement with Olympus." I have located a Non-Disclosure of Information / Secrecy Agreement between Olympus America Inc. and Clay dated 28 February 2012. I have also located a document entitled, "Olympus America Inc. Medical Systems Group Field Sales & Field Sales Management Agreement" between Olympus and Clay with signature dates of 28 February 2012 and 18 July 2012. Please confirm these are the documents to which you referred.

With respect to Olympus's proprietary / confidential information, please be advised that ArthroCare required Mr. Williard represent in writing that he will not disclose any confidential or proprietary information, including trade secrets of prior employers in carrying out his duties for ArthroCare. Mr. Williard had to further agree that he will not bring onto the premises of ArthroCare any unpublished documents or any property belonging to any prior employer or any other person to whom he has an obligation of confidentiality, unless consented to in writing by that prior employer or person.

You requested that ArthroCare provide you with a detailed description of the nature of Mr. Williard's responsibilities to ArthroCare. In order to try to satisfy this request, I requested our Human Resources Department provide me with a copy of Mr. Williard's job description. Pursuant to the job description, Mr. Williard's essential duties and responsibilities include the following:

- Adhere to all cGMP and EN/ISO 13485 administrative responsibilities.
- Meet or exceed the given annual sales quota established each year.
- Properly report field incidents and generate bi-weekly reports to provide feedback from the field.
- Ensure that company property – samples and equipment, including lot control numbers, overall condition and safety, is accounted for and properly maintained.
- Establish and maintain solid business relationships with all key customers, such as surgeons and hospital/surgery center personnel, within the defined geographic area.
- Ensure that all responsibilities within the scope of this job comply with the scope of the ArthroCare Quality System.
- Perform day-to-day scheduling of activities.

Presuming I have the correct agreements, Section 7.(b) of the Olympus America Inc. Medical Systems Group Field Sales & Field Sales Management Agreement between Olympus and Clay with signature dates of 28 February 2012 and 18 July 2012 (the "Non-Compete Agreement") states that Clay agrees that for a period of 12 months following the cessation of his employment with Olympus that he will not be employed by a company that directly competes with Olympus. In researching this aspect, I needed to

orient myself with the products Olympus offers.  According to information found on Olympus's website (see https://medical.olympusamerical.com/specialty/ent) , the featured procedures for ENT are as follows:

- FESS
- Inferior Turbinate Reduction
- Intracapsular Adenotonsillectomy
- Laryngoscopy
- Middle Ear Surgery
- Myringotomy w/Tubes
- Sleep

This website also indicates the featured products in this specialty are as follows:

- DIGEO® ELITE
- Video Rhinolaryngoscope
- Fiber Rhinolaryngoscope (ENF-GP)
- DTAD (70138400)
- Rigid Laryngoscope
- HD Rod Lens Sinuscopes
- Otoendoscopes
- Celon System
- Celon ProBreath (WB9900004)
- Somnoplasty
- Rhinology Instruments
- Myringotomy Instruments & Accessories
- OtoMimix Bone Cement (70143266)
- Smart 360° Pistons
- Uncoated Vent Tubes

Based upon the information contained on this website, I can see that Olympus offers a line of visualization products for ENT – ArthroCare does not.  I can also see that Olympus offers a line of re-usable stainless steel handheld instruments for ENT – ArthroCare does not. Olympus offers a variety of vent tubes – ArthroCare does not.  Olympus offers an array of devices middle ear surgical procedures – ArthroCare does not. Olympus offers shavers – ArthroCare does not.

Based upon my review of these documents, I believe that we have competitive overlap in certain areas. Because I believe it is easier to speak to this in terms of the procedure, I have organized my comments in this fashion, but I have also tried to identify the products for each procedure.  The following are the procedures and known products for such procedures that have been identified to have potential overlap with Olympus:

| Procedures believed to overlap with Olympus | Known Products to have potential overlap with Olympus |
|---|---|
| Turbinate Reduction – Submocosal Resection approach (Turbs-SMR) | ArthroCare Turbinator v. Olympus Diego sinus debrider for Turbinates |
| Turbinate Reduction – Radio Frequency Ablation approach (Turbs-RF) | ArthroCare Coblator v. Olympus Celon |
| Base of Tongue Resection | ArthroCare Coblator v. Olympus Somnus |

| Nasal Splinting / Absorbable product | ArthroCare Stammberger or Synaero v. Olympus Posisep-X |
| Adenoidectomy | ArthroCare Coblator v. Olympus DTAD |
| Laryngeal lesion resections | ArthroCare Coblator v. Olympus Diego sinus debrider blade for laryngeal cases |

Because Olympus offers Nasal Splinting / Absorbable product (also sometimes referred to as post-operative surgical dressing) for the nasal cavity, ArthroCare requires that  Mr. Williard forward inquiries received or requests for such products from customers he called upon in his last two years with Olympus to his manager for processing.   ArthroCare also requires that Mr. Williard forward inquiries/requests from customer Mr. Williard called upon in his last two years with Olympus regarding other procedures/products (i.e., Turbinate reduction, base of tongue resection, adenoidectomy, etc.) believed to be overlapping with Olympus to his manager for processing. These restrictions remain in effect for 12 months following Mr. Williard's cessation of his employment with Olympus.

Please confirm that these safeguards are acceptable to Olympus and avoid the need for litigation.

 Kindest Regards,


_____

**Kari Smith**
*Associate General Counsel*

**ArthroCare Corporation**
Office +512.391.3954   |   Fax +512.391.3901
7000 West William Cannon Drive
Building One
Austin, Texas 78735

U.S.A.

# EXHIBIT G



# Confidentiality, Non-Compete & IP Ownership Agreement

1.  Confidential Information

1.1  Employee shall not, during, prior to or after their employment with Gyrus ACMI, L.P. ("Company"), other than during Employee's employment for and on behalf of Company, or with prior written authorization of Company, (a) use or rely on for any reason, or (b) divulge or communicate to any person, any "Confidential Information."

1.2  The term "Confidential Information" shall include but not be limited to the trade secrets, proprietary and/or confidential information of, or relating to, Company, its ultimate parent, Olympus Corporation (the "Parent") or any of its or their affiliates or of any third party which the Company or its Parent is under an obligation to keep confidential, including without limitation information concerning customers, prospective customers, consultants, suppliers, prospective suppliers, designs, products, product details, discounting arrangements, product applications, existing trade arrangements, terms of business and those in the course of negotiation, operating systems, pricing and fee structures, financial information, sales, marketing and/or business plans, Company Property, Inventions, designs, methods, know-how, techniques, systems, processes, specifications, blueprints, engineering data, software programs, works of authorship, research and development activities, surgical techniques, or Company personnel information (including skills and compensation), which Employee may have created, developed, received, obtained or had access to while employed by Company. All Confidential Information will remain the sole and exclusive property of the Company.

2.  Non-Competition and Non-Solicitation

In consideration of Company's obligations hereunder, including but not limited to, as applicable, offering employment to Employee and/or enhanced compensation, benefits and terms of employment offered to Employee, and/or the provision of new Confidential Information of the Company and/or the Parent provided to Employee upon execution of this Agreement, during your employment with the Company and until the date which is one (1) year after the termination of Employee's employment hereunder for any reason, whether by the Company or Employee, Employee will not, directly or indirectly, alone or with another person or entity (whether as an employee, consultant, partner, member, owner, manager, officer, director, investor, lender or otherwise):

2.1  anywhere within the territory for which Employee is responsible as of the date hereof, engage in, contribute to, assist with or in any way participate in, any activity involving or relating to the conception, design, development, manufacture, marketing, distribution or sale of competitive surgical medical devices in the fields of ENT surgical instruments and implants (the "Business"); provided, however, that Employee's ownership of not more than 2% of the equity securities of any publicly traded company will not, by itself, violate the terms of this Section 2.1.

2.2  solicit, divert, take away or attempt to solicit, divert or take away, any customers of Company, its Parent, or any of their affiliates (a) with whom Employee had contact or whose dealings with Company, its Parent, or any of their affiliates Employee coordinated or supervised or (b) about whom Employee acquired Confidential Information, in each case at any time within two (2) years prior to the cessation of Employee's employment with Company, and for purposes of providing products and/or services that are similar to or competitive with the Business;

2.3  solicit, entice away or in any other manner persuade or attempt to persuade any officer, employee or agent of Company, its Parent, or any of their affiliates to alter or discontinue a relationship with Company or to do any act that is inconsistent with the interests of Company, its Parent or any of their affiliates; or



2.4    solicit, divert, interfere with, or in any other manner persuade or attempt to persuade any supplier or other vendor of Company, Parent or any of their affiliates to alter or discontinue its relationship with Company, Parent or any of their affiliates.

3.    Work Product and Copyrights

Employee agrees that all right, title and interest in and to the materials resulting from the performance of Employee's duties for Company, its Parent or any of their affiliates at any time, including during and after their employment with the Company, and all copies thereof, including works in progress, in whatever media (the "Work"), are, will be and remain the sole and exclusive property of Company. Employee will mark all Work with Company's copyright or other proprietary notice as directed by Company.

4.    Inventions

For purposes of this Agreement, "Inventions" includes, without limitation, information, inventions, contributions, improvements, ideas, discoveries, modifications, designs, developments, processes, software programs, works of authorship, Work, documentation, formulae, data, techniques, know-how, trade secrets and/or any other intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection). Employee agrees that all Inventions that Employee shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice at any time during his or her employment with Company, whether before, during or after their employment with the Company, that (i) relate to the business of the Company, or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) result from tasks assigned to Employee by the Company; or (iii) result from the use of Confidential Information or premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise. Accordingly, Employee hereby assigns to Company and its assigns without further compensation, any rights Employee may have or acquire in and to the Inventions under the laws of the U.S. and all foreign countries and all benefits and/or rights resulting therefrom.    Upon termination of

employment, Employee agrees to promptly return all Confidential Information and Inventions, without retaining a copy, to the Company.

**NOTICE:  This Section 4 does not apply to any Invention for which no equipment, supplies, facility, or trade secret information of Company was used and which was developed entirely on Employee's own time, unless:   (a) the Invention relates (i) directly to the business of Company or (ii) to Company's actual or demonstrably anticipated research or development, or (b) the Invention results from any work performed by Employee for Company.**

5.    General

5.1    This Agreement shall be assignable by Company to any successor or to any other company or division owned, controlled by, controlling or under common control with Company, and shall be binding upon Employee and inure to the benefit of his or her heirs, executors, and administrators. This Agreement, being personal to Employee is not assignable by Employee.

5.2    It is understood that the provisions of this Agreement are severable and in the event that any provision hereof shall be found by any court to be unenforceable, in whole or in part, the remainder of the Agreement shall nevertheless be enforceable and binding on the parties.

5.3    It is understood that the validity, construction, interpretation and enforceability of this Agreement shall be determined and governed by the laws of the state where Employee principally performs services for the Company.

GYRUS ACMI, L.P.

By: _Teresa Slepton_

Date: _10-30-09_

CLAYTON R. WILLIARD

By: _CyR R._

Date: _10/30/09_

OLYMPUS CORPORATION OF THE AMERICAS
OLYMPUS AMERICA INC.
OLYMPUS IMAGING AMERICA INC.
OLYMPUS MEMORY WORKS AMERICA, INC.
GYRUS ACMI, INC.
GYRUS ACMI, L.P.
GYRUS MEDICAL, INC.
GYRUS ENT, LLC

By _____

As a Representative of _____
Entity

Agreed _____
Employee Signature

Name _Clayton Williard_____

Date _5/5/11_____

# EXHIBIT H

Clayton Williard
3223 Judy Pl NE
Albuquerque, NM 87111
505-660-9586

May 12, 2014

Olympus America, Inc.
Mr. Michael Donovan
Regional Vice President

Dear Michael,

I wish to formally notify you that I am resigning from my position as Territory Manager/Field Sales Trainer with Olympus America, Inc. My last day will be May 23, 2014.

I appreciate all the opportunities I have been given working for Olympus ENT. Although this has been an incredibly hard decision, I feel it is time to move on. I also want to thank you for all your professional support and guidance during our time working together the past 18 months. My experience with Olympus has been very valuable and fulfilling.

If I can be of any assistance during this transition, please don't hesitate to let me know.

Thanks again for everything.

Sincerely,


Clayton Williard

**EXHIBIT I**

| **From:** | Matt Scheele [Matt.Scheele@ArthroCare.com] |
|---|---|
| **Sent:** | Wednesday, June 11, 2014 4:35 PM |
| **To:** | Bouchard, Sarah E. |
| **Cc:** | Griffin, Courtney Wirth; Jacobs, Benjamin K. |
| **Subject:** | RE: Clay Williard's Non-Compete Obligations |

Sarah,

We have identified the areas where we believe there are overlaps in competitive products and have made arrangements for Mr. Williard to not sell, process orders, or provide service for these products. We are aware of Mr. Williard's continuing obligations of non-disclosure and non-solicitation and we have required Mr. Williard to represent that he will continue to honor those obligations in carrying out his duties for ArthroCare. However, we cannot agree to the demand that Mr. Williard be removed from the territory or that Mr. Williard no longer offer **any** ENT devices, wherein your expectation of **any** ENT devices would include products that are not overlapping competitive devices and are therefore outside the scope of his non-competition agreement.

Regards,

---

**Matt Scheele**
**Associate General Counsel, Director of Intellectual Property | ArthroCare Corporation**
Office 512.358.5925   |   Mobile 512.284.3427   |   Fax 512.391.3901
7000 West William Cannon Drive, Building One, Austin, Texas 78735

**From:** Bouchard, Sarah E. [mailto:sbouchard@morganlewis.com]
**Sent:** Wednesday, June 11, 2014 10:35 AM
**To:** Matt Scheele
**Cc:** Griffin, Courtney Wirth; Jacobs, Benjamin K.
**Subject:** RE: Clay Williard's Non-Compete Obligations

Matt –

He needs to be out of the territory, or alternatively, work in a different area of your business within the same territory. The restrictive covenants he has signed are reasonable, and do not prevent him from working.   We have obtained emergency and injunctive relief in the past under the same circumstances. Mr. Williard is aware of this fact. Please advise if this continues to be your position.

**Sarah E. Bouchard**
Morgan, Lewis & Bockius LLP
1701 Market Street | Philadelphia, PA 19103-2921
Direct: +1 215.963.5077 | Main: 215.963.5000 | Fax: 215.963.5001
sbouchard@morganlewis.com | www.morganlewis.com
Assistant: Theresa M. Myers | +1 215.963.4917 | tmyers@morganlewis.com

**From:** Matt Scheele [mailto:Matt.Scheele@ArthroCare.com]
**Sent:** Wednesday, June 11, 2014 9:50 AM
**To:** Bouchard, Sarah E.

**Cc:** Brigham, Brandon J.
**Subject:** RE: Clay Williard's Non-Compete Obligations

Sarah – I'm certainly willing to continue the conversation in hopes of reaching a reasonable solution without court involvement. However, your demand left by voice mail didn't seem to leave much room for such a dialogue. My schedule is quite busy today, but if you have time this afternoon between 3:00 and 4:00 CDT and would like to discuss over the phone, please let me know.

Regards,

Matt

**From:** Bouchard, Sarah E. [mailto:sbouchard@morganlewis.com]
**Sent:** Tuesday, June 10, 2014 6:57 PM
**To:** Matt Scheele
**Cc:** Brigham, Brandon J.
**Subject:** Re: Clay Williard's Non-Compete Obligations

Matt --
Thanks for your message, but we are incredibly disturbed by your response. If you believe that this is your final answer, please let us know. This is an enforceable contract, and your knowledge of it and failure to adhere to it creates independent liability for your Company.

**Sarah E. Bouchard**
**Morgan, Lewis & Bockius LLP**
1701 Market Street | Philadelphia, PA 19103-2921
Direct: 215.963.5077 | Main: 215.963.5000 | Fax: 215.963.5001
www.morganlewis.com
Assistant: Theresa M. Myers | 215.963.4917 | tmyers@morganlewis.com

On Jun 10, 2014, at 6:39 PM, "Matt Scheele" <Matt.Scheele@ArthroCare.com> wrote:

> Ms. Bouchard,
>
> This message is a follow up to my voice mail message left with you this afternoon, and in response to your message demanding the immediate removal of Mr. Williard from his duties representing ArthroCare's ENT products. ArthroCare continues to believe that the protections put in place with regard to products overlapping with Mr. Williard's obligations under the Non-Complete Agreement are more than sufficient, and will not at this time deviate from its plan stated below to require Mr. Williard to accordingly forward any inquiries and requests on these overlapping products to his manager for processing and support.
>
> Please contact me with any further questions or concerns.
>
> Regards,
>
> _____
> **Matt Scheele**
> **Associate General Counsel, Director of Intellectual Property | ArthroCare**
> **Corporation**
> Office 512.358.5925 | Mobile 512.284.3427 | Fax 512.391.3901
> 7000 West William Cannon Drive, Building One, Austin, Texas 78735

**From:** Kari Smith
**Sent:** Monday, June 09, 2014 10:44 AM
**To:** 'bbrigham@morganlewis.com'
**Cc:** Matt Scheele
**Subject:** Clay Williard's Non-Compete Obligations

Mr. Brigham:

As indicated in our telephone conversation late Friday afternoon, I have tried to gather as much information as I can regarding Clayton ("Clay") Williard.  Kindly note:  While I, too, am hopeful for a amicable resolution, I have also distributed a notice of litigation hold and evidence preservation memorandum.  While I recognize you have had prior dealings with Mr. Rew, because I was not privy to those conversations I hope you will first confirm that the documents I have gathered are, in fact, the ones to which you refer in your email dated 6 June 2014.

In your email on Friday, you referred to a "Non-Competition and Non-Disclosure Agreement with Olympus." I have located a Non-Disclosure of Information / Secrecy Agreement between Olympus America Inc. and Clay dated 28 February 2012.  I have also located a document entitled, "Olympus America Inc. Medical Systems Group Field Sales & Field Sales Management Agreement" between Olympus and Clay with signature dates of 28 February 2012 and 18 July 2012.  Please confirm these are the documents to which you referred.

With respect to Olympus's proprietary / confidential information, please be advised that ArthroCare required Mr. Williard represent in writing that he will not disclose any confidential or proprietary information, including trade secrets of prior employers in carrying out his duties for ArthroCare.  Mr. Williard had to further agree that he will not bring onto the premises of ArthroCare any unpublished documents or any property belonging to any prior employer or any other person to whom he has an obligation of confidentiality, unless consented to in writing by that prior employer or person.

You requested that ArthroCare provide you with a detailed description of the nature of Mr. Williard's responsibilities to ArthroCare.  In order to try to satisfy this request, I requested our Human Resources Department provide me with a copy of Mr. Williard's job description.  Pursuant to the job description, Mr. Williard's essential duties and responsibilities include the following:

- Adhere to all cGMP and EN/ISO 13485 administrative responsibilities.
- Meet or exceed the given annual sales quota established each year.
- Properly report field incidents and generate bi-weekly reports to provide feedback from the field.
- Ensure that company property – samples and equipment, including lot control numbers, overall condition and safety, is accounted for and properly maintained.
- Establish and maintain solid business relationships with all key customers, such as surgeons and hospital/surgery center personnel, within the defined geographic area.

- Ensure that all responsibilities within the scope of this job comply with the scope of the ArthroCare Quality System.
- Perform day-to-day scheduling of activities.

Presuming I have the correct agreements, Section 7.(b) of the Olympus America Inc. Medical Systems Group Field Sales & Field Sales Management Agreement between Olympus and Clay with signature dates of 28 February 2012 and 18 July 2012 (the "Non-Compete Agreement") states that Clay agrees that for a period of 12 months following the cessation of his employment with Olympus that he will not be employed by a company that directly competes with Olympus.  In researching this aspect, I needed to orient myself with the products Olympus offers.  According to information found on Olympus's website (see https://medical.olympusamerical.com/specialty/ent) , the featured procedures for ENT are as follows:

- FESS
- Inferior Turbinate Reduction
- Intracapsular Adenotonsillectomy
- Laryngoscopy
- Middle Ear Surgery
- Myringotomy w/Tubes
- Sleep

This website also indicates the featured products in this specialty are as follows:

- DIGEO® ELITE
- Video Rhinolaryngoscope
- Fiber Rhinolaryngoscope (ENF-GP)
- DTAD (70138400)
- Rigid Laryngoscope
- HD Rod Lens Sinusscopes
- Otoendoscopes
- Celon System
- Celon ProBreath (WB9900004)
- Somnoplasty
- Rhinology Instruments
- Myringotomy Instruments & Accessories
- OtoMimix Bone Cement (70143266)
- Smart 360° Pistons
- Uncoated Vent Tubes

Based upon the information contained on this website, I can see that Olympus offers a line of visualization products for ENT – ArthroCare does not.  I can also see that Olympus offers a line of re-usable stainless steel handheld instruments for ENT – ArthroCare does not. Olympus offers a variety of vent tubes – ArthroCare does not. Olympus offers an array of devices middle ear surgical procedures – ArthroCare does not. Olympus offers shavers – ArthroCare does not.

Based upon my review of these documents, I believe that we have competitive overlap in certain areas.  Because I believe it is easier to speak to this in terms of the procedure, I have organized my comments in this fashion, but I have also tried to identify the products

for each procedure.  The following are the procedures and known products for such procedures that have been identified to have potential overlap with Olympus:

| Procedures believed to overlap with Olympus | Known Products to have potential overlap with Olympus |
|---|---|
| Turbinate Reduction – Submocosal Resection approach (Turbs-SMR) | ArthroCare Turbinator v. Olympus Diego sinus debrider for Turbinates |
| Turbinate Reduction – Radio Frequency Ablation approach (Turbs-RF) | ArthroCare Coblator v. Olympus Celon |
| Base of Tongue Resection | ArthroCare Coblator v. Olympus Somnus |
| Nasal Splinting / Absorbable product | ArthroCare Stammberger or Synaero v. Olympus Posisep-X |
| Adenoidectomy | ArthroCare Coblator v. Olympus DTAD |
| Laryngeal lesion resections | ArthroCare Coblator v. Olympus Diego sinus debrider blade for laryngeal cases |

Because Olympus offers Nasal Splinting / Absorbable product (also sometimes referred to as post-operative surgical dressing) for the nasal cavity, ArthroCare requires that  Mr. Williard forward inquiries received or requests for such products from customers he called upon in his last two years with Olympus to his manager for processing. ArthroCare also requires that Mr. Williard forward inquiries/requests from customer Mr. Williard called upon in his last two years with Olympus regarding other procedures/products (i.e., Turbinate reduction, base of tongue resection, adenoidectomy, etc.) believed to be overlapping with Olympus to his manager for processing. These restrictions remain in effect for 12 months following Mr. Williard's cessation of his employment with Olympus.

Please confirm that these safeguards are acceptable to Olympus and avoid the need for litigation.

 Kindest Regards,

_____

**Kari Smith**
***Associate General Counsel***

**ArthroCare Corporation**
Office +512.391.3954   |   Fax +512.391.3901
7000 West William Cannon Drive
Building One
Austin, Texas 78735

U.S.A.

DISCLAIMER
This e-mail message is intended only for the personal use
of the recipient(s) named above. This message may be an
attorney-client communication and as such privileged and
confidential and/or it may include attorney work product.
If you are not an intended recipient, you may not review,
copy or distribute this message. If you have received this
communication in error, please notify us immediately by
e-mail and delete the original message.

## VERIFICATION

I, Randy Clark, hereby verify that I am employed as Vice President of Sales, Surgical Division for Olympus Corporation of the Americas and I am authorized to make this verification on behalf of Plaintiff Olympus America Inc. ("Plaintiff"). I further verify that the factual information set forth in Plaintiff's Verified Complaint is true and correct to the best of my knowledge information and belief.

I declare under penalty of perjury pursuant to 28 U.S.C. ¶ 1746 that the foregoing information is true and correct.

Dated: June 12, 2014

_____
Randy Clark